JUDGE ENGELMAYER          **14 CV 6457**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
MARY ARNOLD,

                Plaintiff,

    – against –

ALFONSE D'AMATO, ARMAND D'AMATO,
JERRY BARBANEL, PARK STRATEGIES, LLC,
and PRECISION DISCOVERY, LLC, a/k/a
PRECISION DISCOVERY, INC.,

                Defendants.
-----------------------------------------------------------------x

14 Civ.

**COMPLAINT**

**JURY TRIAL
DEMANDED**

       Plaintiff Mary Arnold, by and through her attorney, Paul Batista, P.C., for her

Complaint in this action respectfully alleges as follows:

### Introduction

    1.    This is an action to recover at least $5 million owed to plaintiff Mary

Arnold based on (i) defendants' fraud and deceptive conduct in systematically concealing and

diverting commissions to which plaintiff is entitled, (ii) breach of a joint venture agreement

between plaintiff and defendants, (iii) breach of contract, (iv) tortious interference in contract,

and (v) aiding and abetting fraud. This action also seeks punitive damages in light of the extent

and willfulness of defendants' misconduct.

    2.    Defendants' misconduct consists, among other things, of a scheme by

defendant Alfonse D'Amato, a former United States Senator who has known Ms. Arnold for

more than thirty years, and the other defendants to utilize Ms. Arnold as the putative head of a

woman-controlled small business in order to secure for defendants' benefit lucrative government

contracts under statutes and regulations that provide favorable treatment to women owned small

businesses. In the absence of defendants' fake claims, defendants did not and could not qualify under relevant law for favorable treatment in securing government contracts.

3. As described in greater detail later in this Complaint, defendants' representations to federal agencies were false since defendants did not in fact allow Ms. Arnold to perform, and had no intention of allowing her to perform, the role of the chief executive of any woman-owned and controlled entity. Defendants insisted that Ms. Arnold pretend to assume the role of a figurehead only in an entity known as AEDiscovery LLC ("AEDiscovery") over which she would have no management control.

4. This well-orchestrated charade – in which Ms. Arnold refused to participate – served to enable defendants, by lying to Government agencies regarding AEDiscovery's management by a woman, the ability to pass through to defendant Precision Discovery LLC, a/k/a Precision Discovery, Inc. ("Precision"), an entity controlled by defendant Armand D'Amato and the other defendants, revenue and benefits that were attributable to Government contracts obtained by AEDiscovery because of its preferred status.

5. In effect, Alfonse D'Amato, Armand D'Amato and the other defendants attempted to utilize Ms. Arnold to act as a stalking horse for them in their effort to deceive and mislead the United States. When Ms. Arnold refused any involvement in defendants' scam, they retaliated against her.

6. Defendants' pattern of misrepresentation and deceit in their dealings with the Government is reflected in defendants' depriving Ms. Arnold of millions of dollars of commissions to which she is entitled. By in effect stealing from Ms. Arnold the significant commissions owed to her, Alfonse D'Amato, Armand D'Amato and the other defendants were able to falsify defendant Precision's balance sheet in order, on the basis of the misleading

presentation of Precision's financial position, to secure public and private sector contracts which would not otherwise have been awarded, to obtain financing which would not otherwise have been provided, and to restructure Precision through the use of inaccurate financial information on a basis more favorable to defendants.

7. Defendants have also harassed Ms. Arnold, verbally abused her, and punished her by severing her connection with Precision when she refused to participate in their scheme to defraud contracting agencies of the United States.

## Jurisdiction and Venue

8. This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a).

## Parties

10. Plaintiff Mary Arnold is a resident of the State of Florida. She is also an attorney admitted to practice in the District of Columbia.

11. Defendant Alfonse D'Amato is a citizen and resident of the State of New York. He is also an attorney admitted to practice in New York.

12. Defendant Armand D'Amato is a citizen and resident of the State of New York. He is also an attorney admitted to practice in New York.

13. Defendant Jerry Barbanel ("Barbanel") is a citizen and resident of the State of New Jersey.

14. Defendant Park Strategies, LLC ("Park Strategies") is a limited liability company organized under the laws of the State of Delaware with offices located in New York and Washington, D.C.

15.   Defendant Precision is a limited liability company organized under the laws of the State of Delaware with its principal place of business located at 25 West 45th Street, Suite 701, New York, New York 10036.

## Statement of Facts Common to All Counts

### A.   General Background

16.   Ms. Arnold worked in the United States Senate from 1981 through 1992. Among other things, she served for two years as an aide to a United States Senator. She also served for nine years as a member of the leadership staff on the Senate floor for the Secretary for the Majority.

17.   Ms. Arnold met Alfonse D'Amato in 1981 when he was a United States Senator from New York. Ms. Arnold worked closely with defendant Alfonse D'Amato during her 11 years in the Senate.

18.   During her last four years of service in the Senate, Ms. Arnold attended the Georgetown University Law Center. After receiving her degree in 1992, she became associated with Black, Manafort, Stone & Kelley ("BMSK") as a senior Government Relations Consultant. While employed at BMSK, Ms. Arnold continued to develop and enhance her reputation in lobbying and business development.

19.   In 1993 she succeeded in gaining AT&T as a client for BMSK. She became the leader of BMSK's activities on behalf of AT&T in dealings with Congress and the Clinton Administration.

20.   While at BMSK, Ms. Arnold also provided strategic counsel and services to clients such as NBC, Lucent Technologies, Johnson & Johnson, and the Commonwealth of Puerto Rico.

21.    In 1998, Ms. Arnold joined AT&T. At the time, AT&T reorganized its Washington, D.C., office and hired James W. Cicconi as its new General Counsel to lead AT&T's Washington office and the legal organization of the company. Ms. Arnold was Mr. Cicconi's initial hire to assist in his new and significant responsibilities. She became the Vice President for Congressional Affairs and federal Government Affairs.

22.    In her new role, Ms. Arnold worked with the Senate leadership and key Senate Committees with jurisdiction of all policy matters affecting AT&T. Moreover, given her extensive background in business development during her time at BMSK, she successfully represented start-up ventures, Fortune 100 companies and countries in achieving their goals in the sale of services and goods to the United States Government. Ms. Arnold was tasked to support AT&T's Government Solutions Sales Team.

23.    In 2004 Ms. Arnold was recruited by SAP AG ("SAP"), a multinational software corporation with headquarters in Germany which develops enterprise software to manage business operations and customer relations. She was selected as Vice President of Government Relations to undertake the opening of the company's Government Relations office in Washington. The new program Ms. Arnold led was a prominent federal affairs practice focused on policy and business development for SAP at federal and state levels. At SAP, she continued her lobbying activities and also further developed her expertise in the highly specialized field of the marketing and sale of goods and services to the Government.

24.    While at SAP, Ms. Arnold, who oversaw a budget of $5.5 million, was responsible for hiring Park Strategies, a firm founded in 1999 by defendant Alfonse D'Amato. Park Strategies describes itself on its website as "provid[ing] . . . clients with a full perspective of [the clients'] business landscape, enabling them to clearly define their strategic objectives and

successfully navigate business policy, development and regulatory issues." Defendant Alfonse D'Amato is a Managing Director of Park Strategies, as is defendant Armand D'Amato.

25.    Ms. Arnold's decision to hire Park Strategies for SAP was based in part on her long relationship with Alfonse D'Amato. In actively cultivating Ms. Arnold to engage Park Strategies for SAP, Alfonse D'Amato emphasized his long and friendly relationship with her.

## B.    The Relationship Between Ms. Arnold and Defendant Precision

26.    In 2009, defendant Armand D'Amato approached Ms. Arnold and advised her that Alfonse D'Amato had long been impressed by her experience in the software and high technology sectors, her roster of friends and business contacts at corporations, law firms, and Government agencies, including the Federal Deposit Insurance Corporation ("FDIC"), and in particular her relationships with key members of senior management of AT&T.

27.    Armand D'Amato suggested that Ms. Arnold meet with defendant Barbanel, who since 2008 had served as the President and Chief Executive Officer of defendant Precision. Ms. Arnold's negotiations with Precision's leadership, including defendant Armand D'Amato, defendant Barbanel and Steven Kristel ("Kristel"), who at the time was the Chairman of Precision's Board of Directors, culminated in a December 1, 2009 contract (the "December 2009 Contract").

28.    Under the December 2009 Contract, Precision engaged Ms. Arnold's services to "secur[e]" business for Precision derived from her extensive "relationships with individuals, law firms, companies" and other "entities." Ms. Arnold was expected "to win engagements" for Precision. According to the December 2009 Contract, her "responsibilities will include, but not be limited to, facilitating introductions to potential Precision . . . clients, making

necessary follow-up contacts with potential clients, and providing such additional services[] as requested by Precision . . . that are designed to secure client engagements."

29. It was clear in the context of the discussions with Armand D'Amato and Barbanel that the central strategic purpose in Precision's hiring of her was for Ms. Arnold to win AT&T and the FDIC as accounts for Precision. The AT&T account represented the potential of many millions of dollars of revenue for Precision, while the FDIC account could result in hundreds of millions of dollars in revenue for the company. Armand D'Amato and Barbanel knew that only Ms. Arnold could deliver AT&T and the FDIC as clients to Precision. Indeed, in an August 13, 2010 email, defendant Armand D'Amato asserted that Ms. Arnold's securing AT&T was Precision's "top priority."

30. Ms. Arnold's compensation under the December 2009 Contract was established "at a straight ten (10) percent of the fees earned and collected by Precision . . . for any engagement awarded to Precision due to your efforts, specifically your efforts in referring the client and assisting us to close the engagement." Ms. Arnold was to report to defendant Armand D'Amato and "other members" of Precision's "management team," including defendant Barbanel and Kristel.

31. The December 2009 Contract also provided that, with respect to any engagement attributable to Ms. Arnold, she was entitled to her ten (10) percent (10%) fee "on a go forward basis as long as you continue to provide active assistance to Precision in securing that business and assisting" in winning "engagements." Her commissions were to continue for as long as Precision had a relationship with clients she had secured for it, even if the contract between Ms. Arnold and Precision was terminated.

32.     The contract also precluded her from working as "an employee" or "independent contractor for any other firm that offers electronic discovery or computer forensics services." Precision was required to provide Ms. Arnold "with copies of all client invoices for engagements that you helped bring [to] Precision so that there is full transparency between us, as we are looking forward to a long-term relationship based on friendship and trust."

33.     Commission payments under the contract were required to be made within ten days of the collection of the revenue by Precision.

## C.     The Engagement of AT&T

34.     Within a week of signing the December 2009 Contract, Ms. Arnold scheduled a meeting with Leonard J. Cali, a close friend and a senior member of AT&T's management. Attending the meeting on December 7, 2009 with Mr. Cali were Ms. Arnold, defendant Armand D'Amato, and defendant Barbanel.

35.     The purpose of the meeting was for Ms. Arnold to introduce Armand D'Amato and Barbanel to Mr. Cali and to establish Precision's credibility with AT&T based on its new association with Ms. Arnold. Since she had worked with Mr. Cali for more than a decade, Ms. Arnold understood the close and trusted relationship Mr. Cali enjoyed with Edward R. Barillari, Senior Vice President and General Counsel for AT&T. Mr. Barillari was responsible for AT&T's entire portfolio of significant antitrust, regulatory and employment litigation. Although Ms. Arnold had known Mr. Barillari for at least a decade, she believed that Mr. Cali's endorsement of Precision would bolster the opportunity for Precision to gain AT&T as a client. Given the volume of litigation in which AT&T was involved, its potential business represented an immense account for Precision. Before Ms. Arnold's involvement, Precision had no access to AT&T.

36.     Just as Ms. Arnold had anticipated, Mr. Cali after the December 7 meeting sent an email on December 11, 2009 to her, Armand D'Amato and Barbanel indicating that Mr. Cali had communicated with Mr. Barillari and that Mr. Barillari was willing to meet with her and other Precision representatives.

37.     As a result of Mr. Cali's December 11, 2009 email, Ms. Arnold contacted Mr. Barillari and arranged a meeting for January 26, 2010 among herself, Mr. Barillari, defendant Alfonse D'Amato, defendant Armand D'Amato and members of Precision's technical staff to demonstrate the company's products and services.

38.     At the January 26, 2010 meeting, Mr. Barillari agreed to assist Precision in becoming a vendor to AT&T for eDiscovery and computer forensics services. Mr. Barillari also undertook to contact law firms to enable Ms. Arnold to establish connections with those firms on behalf of Precision. Mr. Barillari also undertook to contact James W. Grudus, another senior attorney employed by AT&T, so that Mr. Grudus, too, could develop a list of reliable contacts at major law firms whom Ms. Arnold could contact on Precision's behalf.

39.     In fact, Mr. Barillari soon followed through on his promise to provide Ms. Arnold with key information. In an email to Ms. Arnold dated February 1, 2010, Mr. Barillari stressed that he had enjoyed the January 26 meeting which Ms. Arnold had arranged for defendants Alfonse D'Amato, Armand D'Amato and representatives of Precision's technical staff to attend. Mr. Barillari's February 1, 2010 email indicated that he and Mr. Grudus would soon forward the list of law firms for her to contact.

40.     Several days later, Mr. Grudus, in a February 15, 2010 email to Ms. Arnold, wrote: "Mary, as discussed, attached please find a list of law firms and contacts that are

expecting to hear from you [regarding] Precision. I will try to give you a call later today to catch up."

41.    The attachment to Mr. Grudus' email contained a list of law firms, including Mayer Brown, Fulbright & Jaworski, Lowenstein Sandler, Sidley & Austin, Vinson & Elkins, and Reed Smith.

42.    In addition to identifying the law firms as potential clients of Precision, the Grudus email provided the names of specific individuals at those firms whom Ms. Arnold should contact. All of those individuals were either in charge of eDiscovery needs for their firms or litigators with significant eDiscovery or computer forensic needs. Messrs. Grudus and Barillari continued routinely to send leads to Ms. Arnold for potential clients she could solicit for Precision.

43.    In the months following the initial meetings Ms. Arnold arranged with AT&T, she continued to coordinate meetings and conference calls in order to bring about her and defendants' key objective -- the securing of AT&T itself as a customer of Precision under a contract that would result in millions of dollars of revenue for Precision.

44.    In December 2010 -- after a year of efforts led by Ms. Arnold -- it became clear that the key prize of her efforts on behalf of Precision would be awarded. AT&T in December 2010 sent her a series of emails that revealed that Precision had in fact been selected as a vendor to AT&T, that the first project would soon be assigned to Precision, and that AT&T was preparing a written contract.

45.    Defendants have repeatedly acknowledged the overriding significance of Ms. Arnold's role in securing AT&T as a client. In an email dated December 23, 2010 from defendant Barbanel to defendant Armand D'Amato and Kristel, with a copy to Ms. Arnold,

Barbanel wrote: "The new patent matter we were just awarded by AT&T is a nice one. Teriffic job by Mary."

46.     In a contract dated January 24, 2011 (the "AT&T Contract"), AT&T formally retained Precision to provide a range of services in connection with discovery in litigation and computer forensics, among other things. The AT&T Contract, the initial term of which was from January 24, 2011 through December 15, 2012, was estimated to have a value to Precision of between $15 million and $25 million, as specified in the contract itself. Precision renewed its contract with AT&T at the end of 2013 for an additional two years.

## D.     The Engagement of the Coupon Information Corporation

47.     In addition to securing AT&T as a client for Precision, Ms. Arnold also brought about Precision's engagement of the leading association of consumer manufacturers for coupon fraud prevention (the "Association"). The Association is a not-for-profit organization consisting of consumer product manufacturers dedicated to fighting fraud in coupon redemption. The Association, whose membership includes the majority of the largest consumer products manufacturers in the world, has worked with federal, state and local law enforcement officials on every significant coupon fraud case since 1986.

48.     Ms. Arnold had a professional and business relationship spanning approximately three decades with the Executive Director (the "Executive Director") of the Association. The Association with which the Executive Director was affiliated also led reform efforts to improve security practices among all industry participants.

49.     The Executive Director of the Association was also the president of a well-known and respected security and consulting firm specializing in loss prevention.

50.    Ms. Arnold brought about a relationship between the Executive Director and Precision that involved identifying opportunities for loss prevention programs associated with fraudulent coupons.

51.    Precision's relationship with the Association, the Executive Director and the company of which the Executive Director was president (the "Company") provided Precision with a significant stream of monthly revenue and, even more important, brought Precision to the attention of the manufacturers' outside lawyers.

52.    Precision's relationship with the Executive Director, the Association and the Company – a relationship which was of course created by Ms. Arnold – became so well established that, on May 9, 2011, Ms. Arnold, the Executive Director, and Precision entered a written contract (the "May 2011 Contract"). The essential purpose of the May 2011 Contract was the same as the separate December 2009 Contract between Ms. Arnold and Precision. Under the May 2011 Contract, Ms. Arnold and the Executive Director were to secure clients for Precision. In the event they jointly succeeded in doing so, Ms. Arnold and the Executive Director were to split the 10% commission.

53.    Both before and after the May 2011 Contract, Ms. Arnold, together with the Executive Director, substantially assisted Precision to develop strategies designed to provide Precision with contracts for the consumer manufacturing sector. Ms. Arnold and the Executive Director succeeded in associating Precision with Inmar, Inc. ("Inmar"), a company that operates intelligent commerce networks, and NCH Marketing Services, Inc. ("NCH"). Both Inmar and NCH are the foremost coupon processors in the United States.

54.    Defendants recognized the vital opportunities for Precision that Ms. Arnold's and the Executive Director's efforts achieved. In a November 8, 2012 conversation

12

with Ms. Arnold regarding the Association, defendant Barbanel said that the "money that comes in from this coupon stuff, in time, it could be like, a nice little like, you know, annuity." Barbanel also commented: "But the reality is this [the revenue for Precision] that could come from this shit is just humongous."

55.     Likewise, defendant Barbanel in a December 7, 2012 conversation with Ms. Arnold said: "And there's a huge opportunity in this thing."

56.     In fact, as alleged in more detail later in this Complaint, defendants Alfonse D'Amato, Armand D'Amato and Barbanel concealed from both Ms. Arnold and the Executive Director the clients brought to Precision by Ms. Arnold and the Executive Director. Defendants have not provided any information to Ms. Arnold and the Executive Director regarding clients secured by them for Precision, the terms of Precision's contracts with the clients, or the revenue defendants have received from the clients. The list of clients which contracted with Precision because of Ms. Arnold's and the Executive Director's efforts includes, among others, Nestle Waters M.T., a French corporation, Reynolds Consumer Products, LLC, and Kimberly-Clark Corporation.

E.     **Defendants' Misconduct after the AT&T Contract**

1.     **The Theft of Commissions from the Law Firm Introductions**

57.     As previously alleged (*see* ¶¶ 40-41, *supra*), Mr. Grudus of AT&T in a February 15, 2010 email to Ms. Arnold provided her with "a list of law firms and contacts that are expecting to hear from you [Ms. Arnold] regarding Precision. I will try to give you a call later today to catch up."

58.     Because at the time she had complete confidence in the integrity of defendants, Ms. Arnold immediately forwarded the Grudus email to Armand D'Amato, Barbanel and James Kersten ("Kersten"), who was Precision's Chief Marketing Officer. She accompanied

the transmittal of Mr. Grudus' February 15, 2010 email with the following message: "Armand, Jerry and Jim – when can we have a call to discuss a strategy for these meetings? Both Ed [Barillari] and Jim [Grudus] have spoken to these [law] firms which are vendors to AT&T on our behalf."

59. As later events made clear, defendants almost immediately began the process of reneging on their commitments to Ms. Arnold. Just two days after Ms. Arnold forwarded the law firm contact information that had been given to her by the AT&T executives, she was told by Kersten on February 17, 2010 that other sales associates at Precision would be given the task of developing the law firm leads provided to Ms. Arnold by AT&T.

60. Immediately following her February 17 conversation with Kersten, Ms. Arnold sent an email to Kersten which read in part: "Can we resolve the issue of how I will get compensated for business that comes from this outreach from [Mr. Barillari of AT&T]. I know it is [Mr. Barillari's] and [Mr. Grudus'] intention that I would get credit."

61. Kersten's email response was ambiguous, evasive and, as ultimately revealed by the facts, false: "Mary: First, I felt we had a very good conversation today. I am very pleased to have a pro at your level on board with Precision. Easy answer on compensation. You should always get paid for your efforts. So, if Ed [Barillari] can deliver the business through his contacts, you'll get paid for it. Pretty simple. I am here to support your efforts."

62. When Ms. Arnold continued to express concerns about Precision's use of other people to approach the law firms identified by her contacts at AT&T, she was given assurances that Alfonse D'Amato and Armand D'Amato knew she was responsible for bringing business to Precision from the law firms. The D'Amato brothers and others reassured her that she would receive her full commissions from any of the law firms that became Precision customers.

63.    The scope and centrality of Ms. Arnold's efforts were reflected in email exchanges and other communications. For example, in an email dated April 14, 2010, Ms. Arnold advised Armand D'Amato, Kristel, Barbanel and Kersten that "Ed [Barillari] is reaching out to the folks on the list who have not responded, and is encouraging Day Pitney to use us[.]"

64.    On the same day – April 14, 2010 – Ms. Arnold forwarded to Armand D'Amato, Kristel and others at Precision an email exchange between herself and Mr. Barillari in which Mr. Barillari asked for the people at law firms whom she had contacted at his suggestion. In one of the emails from Mr. Barillari he undertook to call the law firm contacts in order to assist her.

65.    By November 2010, Ms. Arnold had become concerned that defendants Armand D'Amato, Alfonse D'Amato and others were in fact deceiving her as to the business from the law firms on the lists which Messrs. Barillari and Grudus had given to her. When Ms. Arnold learned that Alfonse D'Amato and Armand D'Amato had arranged to have lunch with Mr. Barillari, she sent an email to Mr. Barillari in which she requested Mr. Barillari's assistance and support in reminding the D'Amato brothers of their obligations to her.

66.    More specifically, Ms. Arnold, in an email to Mr. Barillari dated November 3, 2010, wrote in relevant part:

> [F]irst of all congratulations on your new position. It is always wonderful to hear of good things happening to great people. I am writing because I knew you were having lunch with Armand and the Senator. And I have a favor to ask if you feel comfortable in bringing it up. A few months ago you were kind enough to send a list of contacts and targets. And although I have a good relationship with both Armand and the Senator and have been diligently working on your list, over time Armand and the Senator seemed to have forgotten to give me credit for the introduction and contacts. They have even shifted those contacts to other people. If you have the chance, I would be most grateful if you would refresh their recollection . . . . Please forgive me for my bold request . . . .

15

67.    Mr. Barillari responded to Ms. Arnold's email with the comment that "[i]t would be my pleasure. Just tell me what you want me to say." After the lunch, Mr. Barillari reported to Ms. Arnold that the D'Amato brothers understood defendants' obligations to her and would see to it that those obligations would be fulfilled.

68.    The assurances Alfonse D'Amato and Armand D'Amato gave to Mr. Barillari regarding defendants' fulfilling their commitments to Ms. Arnold were lies. In fact, the D'Amato brothers, together with defendant Barbanel and others, systematically and over an extended period of time froze Ms. Arnold out of all contracts with the firms identified by Messrs. Barillari and Grudus for Ms. Arnold.

69.    In an effort to learn details about defendants' misconduct in their dealings with her, Ms. Arnold sent a September 19, 2011 email to Armand D'Amato in which she wrote: "Please let me know if you would like me to have Ed Barillari call you directly about what he has done to get me work for Precision Discovery. I am happy to have Ed give you a call. He has made this outreach to help me. And I have been doing outreach for the past year; but on more than one occasion [I] have [been] dropped off from updates on emails from my colleagues [at Precision] as far as follow up."

70.    Defendant Armand D'Amato's response for information was a dismissive, two-word statement: "[N]ot necessary."

71.    Mr. Barillari of AT&T, together with one of his assistants, Paula Phillips, consistently sought to provide assistance and support to Ms. Arnold in the development of Precision's relationships with the AT&T-recommended law firms. Among other things, Ms. Phillips, as evidenced by an email exchange on October 7, 2011, informed defendant Barbanel that Fulbright & Jaworski – one of the law firms on the AT&T list given to Ms. Arnold – was

seriously considering awarding Precision thirty percent of the firm's discovery processing work. In an email dated October 7, 2011, Ms. Arnold wrote Barbanel: "Ed Barillari is out of the country but checking emails. Let's not forget to inform Ed, not only did he introduce me to Tom Barce [of Fulbright & Jaworski] last year but has continued to follow up for me on both Fulbright and AT&T's other law firms [on] this for me ever since. I know he [*i.e.*, Mr. Barillari] will be thrilled."

72.     Despite Ms. Arnold's pivotal and crucial role in securing law firm clients for Precision based on her relationship with Messrs. Grudus and Barillari of AT&T, she has never received any commissions on the substantial revenue Precision has derived from its law firm clients introduced to defendants solely as a result of Ms. Arnold's contacts with AT&T.

### 2.     The Theft of AT&T Commissions

73.     Beginning soon after the securing of the AT&T Contract, defendants have engaged in a lengthy, complex and fraudulent campaign to deprive – in effect, to steal – the commissions to which Ms. Arnold is entitled under the contract.

74.     Ms. Arnold's December 2009 Contract with Precision stated that she would "be provided with copies of all client invoices for engagements that you [Ms. Arnold] helped bring [to] Precision so that there is full transparency between us, as we are looking forward to a long-term relationship based on friendship and trust."

75.     Defendants' commitment to "transparency" and "trust" was a hoax. During her entire tenure at Precision, the information defendants provided to Ms. Arnold was never timely and rarely accurate. Among other things, defendants hid from her invoices Precision sent to AT&T; they concealed the full amounts of payments received from AT&T; and they falsified the selective information and documents they gave her. Ms. Arnold was later

provided *by AT&T itself*, not by defendants, with documents that revealed the scope of defendants' fraudulent and pervasive pattern of conduct.

76. The campaign had many facets, including a wholly unwarranted four-month delay in 2012 in Precision's payments to Ms. Arnold. Under Mrs. Arnold's contract with Precision, those payments were to be made to her within 10 business days of the receipt of payment by Precision from AT&T.

77. During 2012 and until in or about August 2013, defendants Precision, Armand D'Amato, and Barbanel concealed essential information from Ms. Arnold, such as the most critical of all the relevant documents – Precision's full billings to AT&T and AT&T's payments to Precision. Defendants continue to conceal that essential information.

78. Defendants' efforts to deprive Ms. Arnold of full access to AT&T information was an integral element of their campaign to steal commissions from her. One example of defendants' duplicity and evasiveness took place in March 2011. In a March 28, 2011 email, Ms. Arnold requested from Precision information about the status of the billings for the previous month, February 2011, to AT&T. Precision responded: "Mary, [w]ould it be permissible for me to send you the AT&T Billing Spreadsheet to you tomorrow? I want to go through each of the invoices to ensure this exercise has been done accurately."

79. Three days later, Precision sent a March 31, 2011 email: "Mary, I have not forgotten your request . . . . When I arrive to the office first thing in the morning, I will complete your request and send to you . . . ."

80. This promise went unfulfilled. On April 1, 2011, Ms. Arnold received another excuse. Precision did not send the promised, and already month old, information.

Instead, defendants offered another excuse: "Mary, I prepared a spreadsheet for February, however Asha [Parmanand] needs to review it . . . . Upon her approval, I will send to you."

81.     This charade – one which defendants repeatedly performed – never ended. Not having received any information about Precision's February 2011 billings to and collections from AT&T, Ms. Arnold wrote an April 5, 2011 email: "I am a bit concerned, it is April 5 and I still have not received any information regarding the billing for February [2011] . . . . How can we get a system in place to hasten this information and payment?"

82.     Ms. Arnold later learned from information provided to her by AT&T that Precision had in fact submitted five (5) invoices to AT&T in February 2011 and that AT&T had paid all five invoices in full by March 24, 2011.

83.     In 2011 alone, Ms. Arnold received *no* commissions from Precision for the months of March, June and September. AT&T's records ultimately obtained by Ms. Arnold from AT&T itself revealed that her commissions from Precision should have been $1,225.95 for March 2011, $48,633.83 for June 2011, and $107,174.47 for September 2011.

84.     In December 2011, Ms. Arnold wrote to defendant Barbanel to express her continued frustration regarding Precision's excuses, its failures to fulfill the "transparency" obligations of Precision under the contract, and its failure to pay Ms. Arnold on the schedule established by the contract. In a December 5, 2011 email to Barbanel which stated in the subject line "I have had enough," Ms. Arnold wrote: "Jerry – I consider myself a team player; but I am not going to stand for not being paid for work that I have brought to Precision Discovery. Not only work; but the largest account [*i.e.*, AT&T] Precision currently services. I have known and worked with the senior management of AT&T since 1993 when the Chairman and CEO of the company personally hired me. My ties run long and deep with the company. Not only do I

currently represent them on the international front and speak to them almost daily; but I also talk to Ed Barillari on a regular basis in addition to the weekly call with Paula [Phillips] . . . . We ran into this kind of nonsense when Jim Kersten was at Precision and I made Ed [Barillari] aware of the shenanigans with trying to give business he was trying to develop for me to other Precision sales people. [Mr. Barillari] said he made it clear to the D'Amatos that I was to receive credit for his and Paula's outreach. Now I find that out I am not even getting paid on a timely basis . . . . Additionally, per my contract, moving forward I want to be paid 10 days after Precision receives payment from AT&T and I want an accounting of what Precision has been paid over the year and what I have received since I have only had invoices through June . . . . I try to be nice, a team player and helpful to my colleagues. Under no circumstances should you or anyone else equate that with weakness! I am happy to demonstrate to you just how much of a man I can be . . . ."

85. Yet another example of defendants' pattern of lying and deceit is reflected in a November 7, 2012 email from Asha Parmanand ("Parmanand"), the Comptroller of Precision, to Ms. Arnold with a copy of Barbanel in which Parmanand wrote: "I do not work with SAP software but am very familiar with the software we do have and it is accurate . . . . I have told you a number of times that we do not submit invoices to AT&T but enter information directly into their system. I cannot predict when they pay each of their bills or how their Accounting Department bundles to pay for things . . . . I will try my best to have a spreadsheet to you for September [2012] by the end of this week or the beginning of next week, but I can tell you for a fact that we have not received any payments for our September work . . . . So when you take into account when AT&T receives the information they are pretty good about getting it paid by two months or in that range . . . . When you get the September schedule it will reflect all work

we did for them in September, but so far we have not received any monies for that so it will reflect that no monies were paid."

86.     Like so many other assertions by defendants, Parmanand's November 7, 2012 email was false in material ways. Precision had not paid Ms. Arnold any commissions for September 2012, claiming, as the Parmanand email stated, that AT&T was at least two months in arrears. When Ms. Arnold in a November 6, 2012 email asked AT&T directly about the alleged arrears, she received a response from AT&T that it "now pays 45 days which started a week or two but other than that nothing is in arrears – what are they [*i.e.*, Precision] saying has changed with our payments?"

87.     Because of her longstanding and highly positive relationships with AT&T, Ms. Arnold was able, on November 20, 2012, independently to secure from AT&T the Precision invoices. Ms. Arnold at that point learned, among other things, that AT&T required all of its vendors to use a program known as TyMetrix for billings to AT&T. Ms. Arnold learned in addition that vendors to AT&T such as Precision receive detailed training about the TyMetrix system and are from the outset taught how to copy and send invoices, as well as monthly statements, both internally and externally.

88.     Other examples of defendants' pattern of deceit and misrepresentation include email exchanges between Barbanel and Jean Gilliard – another Precision employee – in 2011. In a February 15, 2011 email to Ms. Arnold – an email that was copied to Gilliard – Barbanel wrote: "Mary, this is the invoice that Paula [Phillips of AT&T] requested. We have not yet been trained on this system so we have not yet officially ever submitted an invoice for payment purposes. I will ask [Gilliard] to let you know when we enter our information into their payment system. Best regards, Jerry."

21

89.    Barbanel, as was his practice, was lying. An invoice attached to Barbanel's February 15, 2011 email contained wiring instructions for AT&T to Precision's account for work Precision had performed in January 2011.

90.    Moreover, Ms. Arnold was informed by Precision in an email dated March 7, 2011 that an invoice had been submitted on February 28, 2011 when in fact, as Ms. Arnold later learned from documents provided to her by AT&T in November 2011, the invoice was actually sent by Precision to AT&T on January 31, 2011.

91.    Defendants also lied in the March 7, 2011 email exchange when they claimed that "AT&T is deducting 2% from the bill as per their billing guidelines." In fact, as defendants knew, AT&T had no such policy.

92.    By the end of 2010, Ms. Arnold was devoting virtually all of her time to development activities for Precision. Since her revenue from Precision was the principal source of her income, she was deeply concerned about defendants' failure to act in an open, honest and transparent way, as the contract explicitly required. She steadily learned that defendants were excluding her from any meaningful contact with the clients such as AT&T, CIC and the law firms she had brought to Precision. Since the contract required her to "remain actively engaged in providing assistance to Precision in securing that business and future engagements" in order to receive her commissions, she repeatedly requested that defendants include her in conversations with the clients she had secured, as was routine with the other sales executives associated with Precision.

93.    Ms. Arnold's requests for transparency and participation were routinely ignored and rebuffed by defendants, who, as became increasingly clear, plotted to freeze her out of her role and steal her commissions.

94.   After almost two years of asking defendants for full sets of invoices that Precision had submitted to AT&T, Ms. Arnold sent a November 19, 2012 email to Mr. Barillari of AT&T requesting copies of all Statements of Work and invoices sent by Precision to AT&T for 2011 and 2012.

95.   Barbanel was furious that Ms. Arnold had finally contacted Mr. Barillari to ask AT&T to provide her with essential information that defendants had been hiding from her. In a conversation, Barbanel accused her of having caused a "shit storm" that he "had to deal with" because of her email to Mr. Barillari. Ms. Arnold responded to Barbanel's angry comments: "I didn't create a shit storm. I just simply am asking for the statements of work and the invoices. That's not a shit storm." Barbanel responded, "Mary, I don't even want to get into it . . . ." Ms. Arnold said, "We won't get into it, but it's not an unreasonable request."

96.   Ms. Arnold's contract with Precision entitled her to a 10% fee "on a go forward basis so long as you continue to provide active assistance to Precision Discovery in securing that business and in assisting us with engagements . . . ." Under this provision, Ms. Arnold was entitled to her full commissions for as long as Precision had a relationship with clients she secured for it, even if the December 2009 Contract was terminated. Significantly, at Precision's insistence, Ms. Arnold was precluded from working as "an employee" or "independent contractor for any other firm that offers electronic discovery or computer forensics services."

97.   The scope of defendants' lies and deceptions is reflected in a series of statements made by defendant Armand D'Amato in a conversation on January 5, 2013. Armand D'Amato said, among other things, as he continued to lie and mislead Ms. Arnold:

23

- "We will guarantee you every penny – and I've told you this a couple of times, that you are entitled to, you will get, as long as we have those accounts."

- "Whether we sell the business or not those accounts are yours."

- "And then you got, quite obviously, you got my word and you got the Senator's word on that. If there is something that we have to do with your independent agreement to give you some satisfaction on it we'll certainly do it."

- "Those are yours, if you bring in more they're yours."

- "You're a salesperson . . . you get the account, we'll do the work."

- "Whatever level of comfort you need to make sure that they're your client, number 1. Number 2. Is that you will never ever, ever not get what you are entitled to . . . . Whatever we have to do for that you have."

98.     In a conversation on December 1, 2012, defendant Armand D'Amato acknowledged that defendants had significantly shortchanged Ms. Arnold and told her that "I have my own accountant, by the way, coming in . . . to verify commissions that should have been paid to you, to make sure you get what you're entitled to. And I'm going to continue to do that . . . with anything you bring in. I want you to be 100 percent [assured] that there is nobody that's going to either make a mistake intentionally or unintentionally and deprive you of what you're entitled to. You worked very hard for it, and deserve it. I just wanted to put your mind at ease . . .".

24

99.    Except for Armand D'Amato's acknowledgment to Ms. Arnold that "[y]ou worked very hard for it, and you deserve it," these statements were at the time they were made false and intentionally misleading. Neither defendant Armand D'Amato nor the other defendants had retained an independent accountant to verify the full commissions that should have been paid to Ms. Arnold or took any steps to "continue to do that . . ."

100.    Moreover, defendant Armand D'Amato's assertion that "there is nobody that's going to either make a mistake intentionally or unintentionally and deprive you of what you're entitled to" was false and intentionally misleading because defendants had already developed and implemented a plan and scheme to deprive her of full commissions and to continue to do so with respect to future fees owed to her. Defendants never intended accurately and independently to verify Ms. Arnold's commissions or to pay them.

101.    In their scheme to freeze Ms. Arnold out of access to information regarding AT&T and other clients she brought to Precision, defendants abused, harassed and misled her.

102.    AT&T was and still is the largest client of Precision and, according to Armand D'Amato, it accounts for at least 38% of Precision's revenue. Defendants' conduct was designed, in part, to bring an end to Precision's payment of commissions to her, notwithstanding the fact that under her contract she is entitled to the full commissions for as long as AT&T and others remain clients of Precision.

103.    Defendants had another incentive to divert to themselves the millions of dollars owed to Ms. Arnold. By appropriating the money, Precision was able to fraudulently enhance its putative balance sheet "value" in order to obtain financing from banks and to

restructure the company. By utilizing this artifice, defendants induced financial institutions to provide money and other benefits to them.

104.    At the same time it was publicly misrepresenting its financial situation, Precision was disclosing privately that it was sustaining serious cash flow problems. An email sent on October 6, 2011 by defendant Armand D'Amato to an investor designated as *Giuffrar sullcrom.com* stated: "I apologize for the call yesterday. It was no way to treat a guardian angel . . . . [W]e still have cash flow issues."

105.    When Ms. Arnold in November 2012 was provided by AT&T itself, and not by defendants, with documents associated with AT&T's payments to Precision and Precision's invoices to AT&T, her concerns, suspicions, and questions were confirmed: Precision had defrauded her of hundreds of thousands of dollars in commissions from the inception of the relationship in January 2011 through November 2012. Together with unpaid commissions which have accrued since November 2012, defendants have stolen several million dollars from her.

106.    The failure fully to pay Ms. Arnold was not the result of inadvertence or simple mistake. Instead, it was a scheme devised and implemented by defendant Alfonse D'Amato, defendant Armand D'Amato, defendant Barbanel and others to appropriate money from her and enrich themselves.

107.    As part of the effort to advance their scheme, Alfonse D'Amato, Armand D'Amato and Christopher D'Amato – the son of Alfonse D'Amato and an officer of Precision – in a telephone conversation on December 2, 2012 acknowledged that Precision had substantially underpaid her and systematically withheld commissions from her. Defendant Alfonse D'Amato attributed the misconduct to defendant Barbanel, who Alfonse D'Amato described as

untrustworthy and as someone he had never liked. Alfonse D'Amato said that he, his son, his brother and others were taking steps to oust Barbanel from Precision.

108. In the December 2, 2012 conversation, defendant Alfonse D'Amato reiterated that defendants would retain a forensic accountant to determine the true amount of commissions owed to her. He also assured her that defendants would promptly pay the shortfall, no matter how extensive it was, and that she would be paid accurately and fully in the future. Alfonse D'Amato told Ms. Arnold that her position with Precision was secure. According to Alfonse D'Amato, she should "trust" him.

109. All of these statements by Alfonse D'Amato were lies. Defendants did not intend, and never intended, to determine the true amount by which she had been shortchanged. They never intended to pay the accumulated deficiencies. They never intended to pay her the correct amount of future commissions. Their real intention was to steal her prior commissions, to divert her future commissions to themselves and to terminate her services while retaining clients such as AT&T and depriving her of commissions after her termination. Indeed, the central lie in the December 2, 2012 conversation, as in other conversations, was that Ms. Arnold should "trust" Alfonse D'Amato. The "Senator" was lying when he urged Ms. Arnold to "trust" him.

110. Similarly, defendant Armand D'Amato on December 1, 2012 told Ms. Arnold that "the Senator . . . gave you – I was there – his commitment that nobody is going to pull the wool over your eyes. He would rather trade our company than have you snookered in any way."

111. In a telephone conference on January 5, 2013, Armand D'Amato, as part of defendants' concerted effort to deceive Ms. Arnold, falsely stated that defendant Alfonse D'Amato "insists" that defendants "will guarantee every penny – and I've told you this a couple

of times – that you are entitled to, you will get, as long as we have those accounts – whether we sell the business or not, those accounts as yours."

112. In the same conversation, defendant Armand D'Amato also said: "And then you got, quite obviously, you got my word and the Senator's word . . . . Those [clients attributable to Ms. Arnold] are yours, if you bring in more they're yours. You know with your connections you may get up to two million dollars a year . . . . You get the account, we'll do the work."

113. While Armand D'Amato was correct in conceding that "the Senator" gave Ms. Arnold his "commitment" that Ms. Arnold would be paid fully and kept completely informed, the statement was in all other respects false and misleading. The "Senator" – Alfonse D'Amato – knew that he and the other defendants had not fulfilled, and had no intention of fulfilling, their obligations to Ms. Arnold.

114. Defendant Armand D'Amato, in mid-February 2013, accused Ms. Arnold of not adhering to a so-called "protocol" that allegedly contained a set of rules that governed sales efforts by Precision's employees and independent sales representatives.

115. Since Ms. Arnold had never been given the "protocols" to which Armand D'Amato referred, she asked for the document or documents that reflected or embodied the "protocols." Defendant Armand D'Amato did not provide the "protocols" or describe them because either (i) they did not exist or (ii) if they existed defendants had decided not to provide them to Ms. Arnold in order to create the false pretext that Ms. Arnold was not acting in accordance with the "protocols."

116. On February 19, 2013, defendant Armand D'Amato described Ms. Arnold's request for information as to Precision's billings to, and receipt of revenues from,

28

AT&T and other clients she brought to Precision as "intrusive and misguided." This statement, contained in an email dated February 19, 2013, was intended to intimidate her and was part of the scheme to withhold essential information.

117.    Likewise misleading was a February 2, 2013 email in which Armand D'Amato wrote that Ms. Arnold's request for adequate and full information "implies a lack of trust" in defendants. Given defendants' ongoing pattern of deceit, this is a telling and ironic assertion that was designed to divert Ms. Arnold from her insistence on full disclosure.

**F.    The AEDiscovery Joint Venture**

118.    From the outset, defendants knew what an extraordinary rainmaker Ms. Arnold was, and they were not satisfied in misusing and abusing her to secure the AT&T account and other accounts for Precision. Even while defendants were secretly diverting commissions from her, they devised an illegal scheme to obtain lucrative contracts from government agencies, including the Federal Deposit Insurance Corporation ("FDIC"), the Social Security Administration, the Securities and Exchange Commission, the Department of Energy and others, based on a pattern of false representations to the Government and Ms. Arnold.

119.    Ms. Arnold was familiar with the federal statutes and regulations that made available to women owned business entities favorable treatment in the evaluation of the granting of federal contracts. She made defendants aware of those benefits.

120.    During her discussions with defendants that led to the signing of the December 2009 Contract, Ms. Arnold specifically mentioned her extensive work and contacts with the Government and in particular with the FDIC minority and woman owned business program. As a result, only six days after signing the December 2009 Contract, Ms. Arnold in addition to arranging the previously described meeting she attended with AT&T in order to introduce defendants Armand D'Amato and Barbanel to AT&T, also arranged a lunch meeting

for defendants with Carl Polvinale, the FDIC executive in charge of the agency's minority and woman owned business ("MWOB") program for its Legal Division.

121.   The purpose of the meeting was to persuade Mr. Polvinale to arrange for Ms. Arnold and defendants to be introduced to the head of the FDIC's eDiscovery team. Mr. Polvinale expressed an interest in making the introduction but mentioned that the position was vacant at the time. He said it was anticipated that the position would be filled early in 2010.

122.   Ms. Arnold remained in close contact with Mr. Polvinale. She arranged for defendant Armand D'Amato to attend a meeting with Mr. Polvinale on February 16, 2010 and provided Armand D'Amato with a February 12, 2010 email containing talking points for the imminent conversation with Mr. Polvinale.

123.   During the time from late 2009 through 2010 when the discussions which she initiated with the FDIC were taking place, including Armand D'Amato's February 16, 2010 meeting with Mr. Polvinale of the FDIC, she expressed concerns to defendants about the legality of their involvement in discussions with a Government agency about contracting with an MWOB company that at the time did not in fact exist. Defendants knew as they were in the process of soliciting contracts with the FDIC for the special status accorded to an MWOB that such an entity did not exist. Likewise, defendants knew that the FDIC would never consider a relationship with Precision itself, since it was a company owned and controlled by men.

124.   Defendants ignored Ms. Arnold's concerns that, in their dealings with the FDIC, defendants were conducting a charade – namely, that they were representing to federal officials that the FDIC would have a contract with an MWOB. As she continued to express her concerns to defendants about the legality of their conduct, defendants repeatedly assured her that

they were "taking care" of the creation of a legitimate MWOB of which she would have real control and of which she would be the majority owner.

125.   In September 2010, Ms. Arnold was able to secure a meeting for September 16, 2010 for defendants Armand D'Amato and Barbanel with the new head of the FDIC's eDiscovery Division, Thomas Feeney. Before the September 16 meeting took place, Ms. Arnold again articulated her concerns about the legality of defendants' ongoing misconduct. Responding to her, Barbanel in an email dated September 14, 2010, wrote: "We are clear to use the name [*i.e.*, AEDiscovery] for the meeting [with the FDIC] on Thursday. If all works well we will go and form the new entity."

126.   On September 21, 2010, defendants asked Ms. Arnold to review a document regarding AEDiscovery – an MWOB that did not yet exist – that defendants intended to forward to the FDIC's Mr. Feeney. Defendants entitled the document they sent to Ms. Arnold *AEDiscovery: A Woman Owned Business and Value Added Resource*. The email from defendants accompanying the document stated: "Mary, please find the draft document that we prepared for the FDIC [regarding AEDiscovery] . . . . . As discussed, it is important to get something into the hands of [the FDIC's Feeney] so that we can keep the ball moving, as he seemed genuinely interested in AEDiscovery."

127.   Rather than comply with defendants' charade, Ms. Arnold advised them that she would not move forward until AEDiscovery was formed.

128.   Barbanel responded with yet another lie. In an email dated September 23, 2010, Barbanel wrote: "Mary, I just wanted you to know that after 8 months of hard work developing AEDiscovery, LLC, that we should be receiving the legal documents evidencing the formation of the LLC hopefully by next week. Congratulations on this terrific venture."

129.   Defendant Armand D'Amato was a full participant in the lies. In a September 24, 2010 email to Barbanel on which Ms. Arnold was copied – an email Armand D'Amato entitled "AEDiscovery Proposal to the FDIC" – Armand D'Amato wrote: "FDIC proposal right on the money. Good job. Armand."

130.   Ms. Arnold, in an email to Barbanel on August 27, 2010, informed him that she had arranged a meeting with the FDIC. "[M]y friend at [the FDIC] set up a meeting . . . with Tom Feeney of [the FDIC who is the] . . . new head of all eDiscovery. I was introduced as a women owned firm who is on the MWOB list who has an approved legal services agreement in place with the [FDIC]. Mr. Feeney has agreed to meet with me and my team. I need an email explaining how we can assist FDIC and save them money. Their litigation is growing by leaps and bounds. I spoke to Armand this am. Because I have come in as a woman owned business with strong ties to institution[,] we need to address this issue in the near future."

131.   In an email dated August 28, 2010, Barbanel wrote Ms. Arnold regarding the scheduled meeting with FDIC: "Mary, Please let me know when you are available to speak. I would like to strategize then come up with a meaningful email."

132.   AEDiscovery was designed as a joint venture between Ms. Arnold and Precision and reflected that Ms. Arnold was AEDiscovery's Chief Executive Officer and majority stockholder in order to bid for and secure federal contracts. Defendants registered AEDiscovery with the FDIC as an MWOB and obtained a D-U-N-S Number from Dun & Bradstreet for AEDiscovery and a North American Industry Classification (NAICS) code. In addition, defendants registered AEDiscovery for Government contracting through the Online Certifications and Applications (ORCA) database for the federal Government.

133.    Consistent with that objective, Ms. Arnold was designated as the owner of 51% of AEDiscovery. Precision was the owner of the balance of the company. Ms. Arnold was also designated as the Chairman, Chief Executive Officer, and President of AEDiscovery. Defendant Barbanel was designated as the Chief Operating Officer and General Counsel of AEDiscovery.

134.    Defendants knew that it was impossible for Precision, an entity owned and controlled exclusively by men, to receive favorable treatment when seeking government contracts. As later allegations in this Complaint make clear, defendants never allowed Ms. Arnold to function as the leading executive and owner of AEDiscovery. They nevertheless manipulated her in their misleading efforts to secure government contracts, including contracts from the FDIC. They also, as previously described, registered AEDiscovery with the FDIC as an MWOB.

135.    From 2009 until early 2013, Ms. Arnold arranged several meetings and telephone conference calls for defendants with key officials at the FDIC to earn an FDIC contract for AEDiscovery. During these meetings and conferences, defendants repeatedly emphasized the status of AEDiscovery as a woman-owned business. At the same time, she made arrangements for defendants to approach other federal agencies in order to secure contracts for AEDiscovery as an MWOB.

136.    In March 2012, Ms. Arnold arranged a meeting with Mr. Polvinale as part of the effort to earn the FDIC contract for AEDiscovery. Defendant Barbanel attended the meeting. As Barbanel and Armand D'Amato did on multiple occasions, Barbanel emphasized the status of AEDiscovery as a woman-owned business. Although Ms. Arnold believed AEDiscovery was a woman-owned business, the representations made by Barbanel and Armand

D'Amato to the FDIC were deliberately false, since defendants knew they would prevent her from performing the leading role in AEDiscovery. Defendant Alfonse D'Amato was aware of and assisted in formulating the false representations to the FDIC. In addition, Alfonse D'Amato along with the other defendants directed that Ms. Arnold would act solely as the figurehead of the new entity and directed that 80% of the proceeds to the new entity would be diverted to Precision.

137.   In 2012, while the campaign to secure the FDIC contract was under way, Barbanel took the position that Ms. Arnold's ownership share in, and her compensation from, AEDiscovery should be so significantly reduced that AEDiscovery would not be a woman-owned business. Barbanel proposed to Ms. Arnold that the agreement be "secret" so that the FDIC could continue to be deceived.

138.   In an April 30, 2012 e-mail to defendant Barbanel, Ms. Arnold rejected his proposal and articulated her reasons for doing so:

> I agreed to establish AEDiscovery with you and Precision Discovery . . . in 2010 because I believed, and still do, that it will be a very successful business. Legally, I own 51% of the company and Precision Discovery owns 49%. That is the minimum requirement legally that enables me to establish this is a [women owned business]. I am extremely concerned and demand that this is done 100% by the book. As I am the only one that can have a career-ending reputational risk if anything goes wrong, I will only agree to do this business if I am the one in charge of this and we follow the law to the letter.

139.   Under the secret "contract" Barbanel proposed to Ms. Arnold, he was to receive half of Ms. Arnold's 50% ownership of AEDiscovery. Barbanel also proposed that he would receive 43.5% of her compensation derived from AEDiscovery and that he would control the business.

140. Barbanel's secret proposal would have negated Ms. Arnold's status as the principal owner of AEDiscovery. Barbanel proposed that the secret agreement would be hidden from the FDIC.

141. Barbanel's proposal would have violated the FDIC's rules for MWOBs and federal laws and regulations relating to woman and minority owned businesses. Ms. Arnold rejected Barbanel's corrupt proposal from the moment he mentioned it.

142. Barbanel also sought to hide information about his secret proposal from defendants Armand D'Amato and Alfonse D'Amato. In a conversation on November 8, 2012, Barbanel said of defendant Armand D'Amato, in describing why he should be excluded from meetings and conferences with clients and potential clients, "that Armand, you know, has some – you know, he's sort of getting old, and his, like his mind is sort of going. He's . . . not, you know, totally all there."

143. In a November 20, 2012 email to defendant Armand D'Amato, Ms. Arnold, who had already disclosed to defendants Armand D'Amato and Alfonse D'Amato defendant Barbanel's "secret" and illegal proposal to conceal the true ownership of AEDiscovery, summarized the facts and the illegal nature of the Barbanel proposal:

> . . . I know you have seen some crazy documents composed by Jerry Barbanel that neither Armand or his brother [Alfonse D'Amato] were aware of or more importantly I agreed to or was willing to sign. [Defendant Barbanel] also left Armand out of the formation of the company so this is new to him as well
>
> As everyone knows[,] I am all about transparency, fairness and following the letter of the law. It is very important to me that both Armand and his brother feel extremely comfortable with every aspect of AEDiscovery and the business agreement that [AEDiscovery] will have with Precision.
>
> According to the federal statutes and the rules of the FDIC[,] a minority woman owned business must have 51%

35

> ownership of the company and have full control of [its] management . . . .
>
> Having said that[,] I think the business agreement between AEDiscovery and Precision will be pivotal to providing the D'Amatos with the necessary comfort to know [that] the rights and revenue stream are protected . . . .
>
> Because government contracting has come under such scrutiny in recent times with Jack Abramoff and the Administration's decision to label all government contractors suspect[,] I believe it is imperative for not only meeting the smell test of being a real company[,] but also keeping us all out of trouble and I hate to say me most of all because I will be the one holding the bag [if the laws are not complied with].

144.   In fact, defendants Armand D'Amato, Alfonse D'Amato and Barbanel were not interested in having a legitimate woman owned enterprise. Their interest was to manipulate Ms. Arnold so that defendants would secure government contracts under the pretense of Ms. Arnold's ownership and control of AEDiscovery.

145.   Defendants continued to insist that Ms. Arnold serve as a mere figurehead. Ms. Arnold repeatedly and clearly objected to this. In a December 1, 2012 conversation with Armand D'Amato, he advised her (i) that he had discussed her objections with Alfonse D'Amato, (ii) that Alfonse D'Amato and Armand D'Amato did not want her to have any role in eDiscovery work for the FDIC or other government agencies, and (iii) that her role on behalf of AEDiscovery was in effect to "take clients out" and "hold their hands."

146.   In the same conversation, Armand D'Amato said that he and his brother wanted her to perform a misleading role. The D'Amato brothers wanted her to act as if she had more than a "hand-holding" function given that AEDiscovery was securing the contract as an MWOB. Ms. Arnold commented that the D'Amatos in effect were asking her to engage in criminal conduct with them since lying to federal agencies is a criminal offense. Armand

D'Amato, who had once been convicted of federal crimes but whose conviction was overturned on appeal, assured Ms. Arnold that she would not be going to jail.

147.   Because of the profound sense of unease that defendants' conduct had caused her to experience by their insistence that she join their illegal conduct, Ms. Arnold contacted Amy Kim of the Small Business Administration for Ms. Kim's guidance as to how to deal with defendants' bullying of her and their threats that they would sever her relationship with Precision and AEDiscovery unless she fully participated in their schemes.

148.   Ms. Arnold sought Ms. Kim's guidance and views in a February 28, 2013 email:

> Amy – I need your advice. I have been working with a larger company [Precision] now for several years and we decided to establish a [new] company which would be 51% owned by me and 49% owned by them. I am the Chairman and CEO. The reason you haven't heard from me for the last several months is that they have been threatening me and bullying me into agreeing that I would be a figurehead for this company they would have all of the client involvement, do all the work and just inform me of what was going on . . . . They are still bullying me along with threatening my job with the parent company. Confidentially, can you please give me some thoughts on what actions I may have at my disposal. Also, does the SBA have some sort of pronouncement about the role of women owned small business or MWOB businesses stating that if they partner with a larger company the women owned small business has to have a real role. When we met last year you mentioned I would have to take an active role in all matters and act as a senior project manager on all work the combined group engaged in with the federal government . . . . I feel scared and helpless so anything you can do would be much appreciated.

149.   In fact, defendants Armand D'Amato, Alfonse D'Amato and Barbanel were not interested in having a legitimate woman owned enterprise. Their actual interest was to manipulate Ms. Arnold so that defendants would secure Government contracts under the pretense of Ms. Arnold's ownership and control of AEDiscovery.

150.    As the destruction of the joint venture by defendants continued to its final stages, Ms. Arnold in a March 6, 2013 email to defendant Armand D'Amato, defendant Barbanel and others re-emphasized that the "secret" document Barbanel unsuccessfully sought to have Ms. Arnold sign in 2012 was "illegal on its face" and "would [have given] him a controlling stake in AEDiscovery and a means of taking over Precision . . . ." In the same email Ms. Arnold stressed "that I refused to sign it even though I was threatened several times by Jerry [Barbanel] that if I did not do so he would kill the FDIC deal . . . . I am sending this because I am tired of all of the false accusations and attempted impugning of my work ethic . . . . It amounts to nothing other than character assassination . . . "

151.    The joint venture's demise became apparent when defendant Barbanel sent a February 4, 2013 email to Ms. Arnold, with a copy to Armand D'Amato, asking her to arrange another meeting with the FDIC's Mr. Polvinale. Barbanel also wrote in the same email that "I would recommend that after lunch Armand, you and me [sic] sit down and go over some other business."

152.    Ms. Arnold's response to Barbanel's February 4, 2013 email was that it was essential that she and defendants discuss at the proposed meeting the requirement of transparency in their working together.

153.    After receiving Ms. Arnold's email, defendants cancelled the proposed meeting.

154.    The conduct of defendants with respect to AEDiscovery constituted a breach of the joint venture. As a result, Ms. Arnold was deprived of substantial revenue attributable to the opportunity to have a contract with the FDIC and other government agencies.

155.    The collapse of the joint venture coincided with the period of time spanning 2011 through August 2013 when defendants were concealing the full amount of commissions owed to Ms. Arnold by Precision derived from the AT&T and other relationships she had secured for Precision.

## G.    The Termination of Ms. Arnold

156.    Defendants terminated the contract between Precision and Ms. Arnold in August 2013. Defendants continue to receive millions of dollars in payments from AT&T and others. They are not paying Ms. Arnold any of the commissions collected by Precision from AT&T and other clients brought by her to the company.

### Count I

157.    Plaintiff repeats and realleges each and every allegation of ¶¶ 1-156, *supra*.

158.    During the period January 1, 2011 to the present, defendants Alfonse D'Amato, Armand D'Amato, Precision and Barbanel engaged in a scheme to withhold and conceal, and in fact withheld and concealed, at least $5 million to which Ms. Arnold is entitled.

159.    In furtherance of that scheme, defendants Alfonse D'Amato, Armand D'Amato, Precision and Barbanel made misrepresentations to Ms. Arnold – in other words, deliberately lied to her – in order to deceive her, as alleged in detail earlier in this Complaint.

160.    Upon information and belief, defendants Alfonse D'Amato, Armand D'Amato, Barbanel and Precision deliberately refused to disclose to Ms. Arnold billing and collection information regarding AT&T and other clients brought to Precision by Ms. Arnold so they could divert to themselves money owed to her.

39

161.    Another essential element of the scheme to defraud was a pattern of repeated lies to Ms. Arnold in which they falsely represented that the information defendants were providing to Ms. Arnold was complete and accurate when, in fact, it was not.

162.    Yet another element of defendants' misconduct was a pattern of verbal abuse and intimidation directed at Ms. Arnold. They ridiculed her and denigrated her experience and qualifications in an effort to force her to abandon her claims against them.

163.    By reason of the foregoing, plaintiff has been damaged by defendants in an amount to be determined at trial but believed to exceed $5 million.

## Count II

164.    Plaintiff repeats and realleges each and every allegation of ¶¶ 1-163, *supra*.

165.    Defendants Alfonse D'Amato and Park Strategies (i) knew of the existence of the contract and contract relations between plaintiff and Precision and (ii) procured a breach by Precision of the contract and contract relations between plaintiff and Precision.

166.    Defendant Alfonse D'Amato, who is neither an officer, director nor employee of defendant Precision, and defendant Park Strategies received economic advantage from Precision's failure to pay plaintiff.

167.    By reason of the foregoing, plaintiff has been damaged by defendants Alfonse D'Amato and Park Strategies in an amount to be determined at trial but believed to exceed $5 million.

## Count III

168.    Plaintiff repeats and realleges each and every allegation of ¶¶ 1-167, *supra*.

169.   Defendant Precision was a member with Ms. Arnold of a joint venture relating to AEDiscovery.

170.   As a member of the joint venture, Precision owed fiduciary duties of loyalty, good faith and fair dealing to its co-venturer, Ms. Arnold.

171.   Defendant Precision breached its duties to Ms. Arnold and the joint venture.

172.   By reason of the foregoing, defendant Precision has damaged Ms. Arnold in an amount to be determined at trial but believed to exceed $5 million.

## Count IV

173.   Plaintiff repeats and realleges each and every allegation of ¶¶ 1-172, *supra*.

174.   Defendants Alfonse D'Amato, Park Strategies, Armand D'Amato and Barbanel aided and abetted the violation of the fiduciary duties owed to Ms. Arnold under the AEDiscovery joint venture.

175.   By reason of the foregoing, defendants Alfonse D'Amato, Park Strategies, Armand D'Amato and Barbanel have damaged Ms. Arnold in an amount to be determined at trial but believed to exceed $5 million.

## Count V

176.   Plaintiff repeats and realleges each and every allegation of ¶¶ 1-175, *supra*.

177.   Defendants Alfonse D'Amato, Armand D'Amato, Barbanel and Park Strategies aided and abetted the commission of the scheme to defraud and deprive Ms. Arnold of the commissions to which she was entitled from Pinnacle.

41

178.   By reason of the foregoing, defendants have damaged plaintiff in an amount to be determined at trial but believed to exceed $5 million.

<u>**Count VI**</u>

179.   Plaintiff repeats and realleges each and every allegation of ¶¶ 1-178, *supra*.

180.   Defendant Precision has breached the contract between it and plaintiff by (i) failing to provide complete, accurate and timely information to Ms. Arnold and (ii) concealing and failing to pay commissions to which Ms. Arnold is entitled.

181.   By reason of the foregoing, defendant Precision has damaged plaintiff in an amount to be determined at trial but believed to exceed $5 million.

WHEREFORE, plaintiff Mary Arnold requests that the Court enter judgment:

- On Count I, awarding damages in an amount to be determined at trial but believed to exceed $5 million;

- On Count II, awarding damages in an amount to be determined at trial but believed to exceed $5 million;

- On Count III, awarding damages in an amount to be determined at trial but believed to exceed $5 million;

- On Count IV, awarding damages in an amount to be determined at trial but believed to exceed $5 million;

- On Count V, awarding damages in an amount to be determined at trial but believed to exceed $5 million;

- On Count VI, awarding damages in an amount to be determined at trial but believed to exceed $5 million; and

- Awarding punitive damages in the amount of at least $20 million.

Plaintiff demands trial by jury.

Dated: New York, New York
August 12, 2014

PAUL BATISTA, P.C.

By _____
Paul Batista
Attorney for Plaintiff Mary Arnold
26 Broadway – Suite 1900
New York, New York 10004
(212) 980-0070 (Tel)
(212) 344-7677 (Fax)
Batista007@aol.com

43