```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                  :
MARY ARNOLD,                                                      :
                                                                  :      14 Civ. 6457 (PAE)
                                Plaintiff,                        :
                                                                  :      OPINION & ORDER
                -v-                                               :
                                                                  :
ALFONSE D'AMATO, ARMAND D'AMATO, JERRY                            :
BARBANEL, PARK STRATEGIES, LLC, and                               :
PRECISION DISCOVERY, LLC, a/k/a PRECISION                         :
DISCOVERY, INC.,                                                  :
                                                                  :
                                Defendants.                       :
                                                                  :
------------------------------------------------------------------X
```

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/23/15
```

PAUL A. ENGELMAYER, District Judge:

In this diversity action, Mary Arnold brings breach of contract and other claims against Precision Discovery, LLC ("Precision") and its affiliates. Arnold's principal claim is that she was retained to generate business for Precision under an independent contractor agreement (the "Agreement"), but was denied commissions and the opportunity to earn other commissions to which she was entitled under that Agreement. She separately claims that she was party to an unwritten joint-venture agreement with the defendants, which was breached when the defendants attempted to involve her in a scheme to solicit, by means of fraudulent representations, contracts from a government agency.

The defendants—Precision, Alfonse D'Amato ("Alfonse"), Armand D'Amato ("Armand"), Jerry Barbanel, and Park Strategies, LLC ("Park Strategies")—now move to compel arbitration pursuant to a binding arbitration clause in the Agreement. For the following reasons, the Court grants that motion, and stays this action pending the outcome of arbitration.

**I.      Background**[1]

     **A.      The Parties**

Precision, originally founded as a Delaware limited liability company, is a New York corporation that provides its clients with eDiscovery, computer forensics, and software solutions. Pearson Letter, Ex. A ¶ 3.  Park Strategies, a Delaware limited liability company and affiliate of Precision, raises money for Precision.  Compl. ¶ 14; Pearson Letter, Ex. B ¶ 2.

Alfonse and Armand, both New York citizens, are managing directors of Park Strategies and were equity partners of Precision when it was a limited liability company.  *Id.*, Ex. A ¶ 4, Ex. B ¶ 3.  Barbanel, a New Jersey citizen, is Precision's current president and chief executive officer ("CEO"), and a member of its board of directors.  *Id.*, Ex. A ¶ 2.

Arnold, a Florida resident, was an independent contractor for Precision between December 1, 2009 and October 18, 2013.  Compl. ¶ 10; Pearson Decl., Ex. B, at 1.

     **B.      Factual Background**

In 1981, Arnold, a congressional aide, met Alfonse, then a United States Senator from New York; she worked with him in Congress until 1992.  *Id.* ¶¶ 16–17.  That year, Arnold received a law degree, and became a senior government relations consultant at Black, Manafort, Stone & Kelley ("BMSK").  *Id.* ¶ 18.  While working as a lobbyist at BMSK, Arnold took on AT&T as a client; later, in 1998, she joined AT&T as its vice president for congressional affairs and federal government affairs.  *Id.* ¶¶ 19, 21.  In 2004, Arnold joined SAG AG, a multinational

---

[1] The facts that form the basis of this Opinion are drawn from the Complaint, Dkt. 1 ("Compl."); the declarations of Lawrence M. Pearson, Dkt. 7 ("Pearson Decl."), Alfonse D'Amato, Dkt. 8 ("Alfonse Decl."), Armand D'Amato, Dkt. 9 ("Armand Decl."), and Jerry Barbanel, Dkt. 10 ("Barbanel Decl.") in support of defendants' motion to compel arbitration; the declaration of Mary Arnold in opposition to the motion, Dkt. 17 ("Arnold Decl."); and the letter from Lawrence M. Pearson regarding the names and citizenship of all members of Park Strategies and Precision, Dkt. 24 ("Pearson Letter").

2

software corporation, as vice president of government relations; in that role, she hired Park Strategies, which aids clients in "business policy, development and regulatory issues." *Id.* ¶¶ 23–24.

In 2009, Armand, Alfonse's brother, encouraged Arnold to meet with Barbanel, Precision's president and CEO. *Id.* ¶ 27. In December 2009, as detailed below, Arnold entered into the Agreement to serve as a business generator, or "rainmaker," for Precision. Arnold claims, however, that defendants (1) deprived her of commissions she was owed under the Agreement, and (2) attempted to involve her in a fraudulent scheme to gain special contracts from a government agency, which was in breach of a joint-venture agreement she had orally entered into with them. More specifically, Arnold alleges the following:

### 1. Deprivation of Commissions

On December 1, 2009, after negotiating with Barbanel, Armand, and other Precision executives, Arnold entered into the Agreement to work as an independent contractor for Precision. *Id.* ¶ 27. The parties to the Agreement were Arnold and Precision; Barbanel signed on behalf of Precision. Alfonse Decl., Ex. A, at 4.

Under the Agreement, Arnold was to "assist Precision . . . [in] win[ning] engagements" by "facilitating introductions to potential Precision . . . clients, coordinating meetings between Precision . . . representatives and potential clients, making necessary follow-up contacts with potential clients, and providing such additional services, as requested by Precision . . . , that are designed to secure client engagements." *Id.* at 1. Arnold alleges that Armand and Barbanel told her that their goal was for her to bring in clients—specifically, AT&T and the Federal Deposit Insurance Corporation ("FDIC")— as accounts for Precision. Compl. ¶¶ 28–29. Under the Agreement, Arnold was to be paid a "straight ten (10) percent of the fees earned and collected by

Precision . . . for any engagement awarded to Precision . . . due to [her] efforts, specifically [her] efforts in referring the client and assisting [Precision] to close the engagement." *Id.*

Arnold thereafter secured several clients for Precision. For example, on January 24, 2011, Precision, as a result of Arnold's connections and her meetings with representatives from AT&T, signed a contract with AT&T worth between $15 million and $25 million for Precision. *Id.* ¶ 46. Arnold also helped Precision gain Nestle Waters M.T., Kimberly-Clark Corporation, and Reynolds Consumer Products, LLC, as clients. *Id.* ¶ 56.

In February 2010, Arnold began to express concern to Precision officials, including Alfonse and Armand, about her compensation. *Id.* ¶¶ 59–62. She alleges that she had given Precision a list of potential clients and their contact information, which Precision had assigned to other sales associates for development. *Id.* However, Precision did not tell her how, or whether, she would be compensated for business generated from those client leads. *Id.* In 2010 and 2011, Arnold repeatedly asked defendants about her commissions. *Id.* ¶¶ 60, 78, 81.

On December 5, 2011, Arnold, by email, told Barbanel that he, and Precision, were in breach of contract because Precision had failed to pay her commissions for client accounts she had assisted Precision in obtaining, and specifically for failing to pay her commissions on the AT&T account within 10 days of receiving payments from AT&T, as the Agreement required. *Id.* ¶ 84. In November 2012, Arnold obtained copies of the documents reflecting AT&T's payments to Precision from AT&T; these, she states, revealed that Precision had underpaid her commissions between January 2011 and November 2012. *Id.* ¶ 105.

In August 2013, defendants terminated the Agreement. *Id.* ¶ 156. Arnold alleges that Precision continues to receive millions of dollars in payments from AT&T and other clients that

Arnold brought in, and that she is entitled to, but has not received, commissions based on these payments.  *Id.*

### 2. Attempted Involvement in a Fraudulent Scheme

Separately, Arnold alleges, she entered into an oral joint-venture agreement[2] with Precision to found AEDiscovery, a Precision subsidiary and Delaware limited liability company for which Arnold is majority owner, and Precision is minority owner, and to apply for federal contracts in that entity's name.  *Id.*  ¶¶ 132–33; Barbanel Decl. ¶ 5.  Arnold alleges that she alerted defendants, when negotiating the Agreement with them, that women- or minority-owned businesses were given "favorable treatment" when applying for certain federal contracts, including from the FDIC.  Compl. ¶¶ 119–20.  She claims that the purpose of founding AEDiscovery was to capitalize on the advantage.  *Id.*  Arnold further alleges that, on December 7, 2009, six days after signing the Agreement, she put defendants Armand and Barbanel in touch with an FDIC official in charge of a part of the agency's program to assist women- and minority-owned businesses.  *Id.* ¶ 120.  Arnold alleges that defendants thereafter attempted to solicit contracts from the FDIC on the premise that the entity applying for such benefits was majority-owned by a woman, Arnold, even though that entity, AEDiscovery, had not yet been founded.  *Id*. ¶ 123.  Because AEDiscovery did not yet exist, Arnold states, at various points in late 2009 and 2010, she told defendants that their representations to the FDIC might be misleading and unlawful.  *Id.* ¶¶ 123–24.

Defendants eventually founded AEDiscovery and registered it with the FDIC as a woman-owned business, with Arnold designated as the company's 51% owner, chairman, chief

---

[2] Arnold, in her Complaint, does not explicitly state that the joint-venture agreement was orally made, but also does not attach a copy of the joint-venture agreement to any of her submissions. The Court therefore infers that this was an oral agreement.

executive officer, and president, and Precision as the owner of the remaining 49% of the company. *Id.* ¶¶ 132–33. Barbanel was appointed AEDiscovery's chief operating officer and general counsel. *Id.* ¶ 133. In 2012, Barbanel sought to renegotiate Arnold's ownership share in, and compensation from, AEDiscovery. *Id.* ¶ 137. Under the "secret" agreement that Barbanel proposed, Arnold's ownership share of and compensation from AEDiscovery would be reduced to levels at which it could no longer qualify as a woman-owned business. *Id.* ¶ 137. Specifically, Barbanel proposed, he would secretly receive half of Arnold's ownership share and 43.5% of her AEDiscovery compensation, although the company would continue to be publicly held out as majority-owned by Arnold. *Id.* ¶ 139.

On April 30, 2012, Arnold notified Barbanel via email that she rejected the proposed agreement. *Id.* ¶ 138. She alleges that she "demand[ed] that" AEDiscovery be formed "100% by the book," and stated that she would "only agree to do this business if [she was] the one in charge" and if the defendants "follow[ed] the law to the letter." *Id.* ¶ 138. Arnold alleges that Barbanel attempted to hide this proposed secret agreement from Armand and Alfonse. *Id.* ¶ 142.

On February 28, 2013, uneasy about whether defendants' conduct with respect to AEDiscovery was lawful, Arnold sent an email to a Small Business Administration ("SBA") representative, seeking advice on how to "deal with defendants' bullying of her and their threats that they would sever her relationship with Precision and AEDiscovery unless she fully participated in their schemes." *Id.* ¶ 147. She told the SBA that defendants were "threatening [her job with Precision] and bullying [her] into agreeing that [she] would be a figurehead for [AEDiscovery]," and that in doing so, they were fraudulently misrepresenting the company to the FDIC. *Id.* ¶ 146. Arnold's Complaint does not indicate how, or whether, the FDIC

responded to her email. However, Arnold alleges, in August 2013, the joint venture ended. *Id.* ¶ 155.

### C. Procedural History

On August 13, 2014, Arnold filed the Complaint. Dkt. 1. As causes of action, Arnold alleges: (1) fraud and deceptive conduct by Alfonse, Armand, Barbanel, and Precision in "systematically concealing and diverting commissions to which [Arnold] is entitled" under the Agreement; (2) breach of contract, based on the Agreement, by Precision; (3) breach of contract, based on the joint-venture agreement, by Precision; (4) tortious interference with the Agreement by Alfonse and Park Strategies; and (5) aiding and abetting fraud by Alfonse, Armand, Barbanel, and Park Strategies regarding the deprivation of commissions and breach of the AEDiscovery joint-venture agreement. Compl. ¶¶ 1, 157–81. Arnold seeks at least $5 million in compensatory damages, and at least $20 million in punitive damages. *Id.* ¶¶ 42–43.

On September 15, 2014, the defendants moved to dismiss the Complaint and compel arbitration. Dkt. 5, 6 ("Defs. Br."). The basis for this motion is the Agreement's arbitration clause, which reads:

> Any controversy or claim arising out of, or relating to services or compensation provided by Precision . . . and covered by this letter (including any such matter involving any parent, subsidiary, affiliate, successor in interest of Precision . . . ) shall be submitted first to voluntary mediation, and if mediation is not successful, then to binding arbitration, in accordance with the dispute resolution procedures set forth in the attachment to this letter. Judgment on any arbitration award may be entered in any court having proper jurisdiction.

Alfonse Decl. Ex. A, 4. As to dispute resolution procedures, the Agreement provides:

> Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act and resolved by the arbitrators.

*Id.* at 6.

7

On October 9, 2014, Arnold filed a brief in opposition. Dkt. 18 ("Pl. Br."). On October 24, 2014, defendants filed a reply. Dkt. 22 ("Defs. Reply Br."). On June 4, 2015, the Court heard argument. *See* 6/4/15 Tr.

## II.     Applicable Legal Standards under the Federal Arbitration Act

The Federal Arbitration Act ("FAA") "creates a body of federal substantive law establishing and governing the duty to honor agreements to arbitrate disputes." *Mitsubishi Motor Corp. v. Soler Chrysler-Plymouth, Inc.*, 417 U.S. 614, 625 (1985) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 (1983)). The FAA was enacted to reverse "centuries of judicial hostility to arbitration agreements" and "to place arbitration agreements 'upon the same footing as other contracts.'" *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 510–11 (1974) (citation omitted).

The Act accordingly provides that an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for revocation of any contract." 9 U.S.C. § 2. The Act, based on Congress's powers to regulate interstate commerce and admiralty, applies to any "contract evidencing a transaction involving commerce." *Id.*; *see also Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 400 (1967).

In resolving a claim that an action must be directed to arbitration under an arbitration agreement, this Court must determine: (i) whether the parties entered into an agreement to arbitrate; (ii) if so, the scope of that agreement; (iii) if federal statutory claims are asserted, whether Congress intended those claims to be nonarbitrable; and (iv) if some, but not all, claims are subject to arbitration, whether to stay the balance of the proceedings pending arbitration. *See Guyden v. Aetna, Inc.*, 544 F.3d 376, 382 (2d Cir. 2008); *JLM Indus., Inc. v. Stolt-Nielsen SA*,

387 F.3d 163, 169 (2d Cir. 2004); *Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 75–76 (2d Cir. 1998).

Importantly, notwithstanding the strong "national policy favoring arbitration" reflected in the FAA, *see Southland*, 465 U.S. at 10, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit," *AT & T Techs. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (citation omitted). It is a "fundamental principle that arbitration is a matter of contract," *AT & T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1745 (2011) (quoting *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010)), and "strictly 'a matter of consent,'" *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010) (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989)). Therefore, although a presumption of arbitrability under the FAA applies to other issues, that presumption does not bear on the threshold issue of whether the parties entered into a binding agreement to arbitrate at all. *See Applied Energetics, Inc. v. NewOak Capital Mkts., LLC*, 645 F.3d 522, 526 (2d Cir. 2011) ("[T]he presumption does not apply to disputes concerning whether an agreement to arbitrate has been made."); *Abram Landau Real Estate v. Bevona*, 123 F.3d 69, 72 (2d Cir. 1997). Instead, "[w]hen deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *see also Granite Rock*, 561 U.S. at 296; *Applied Energetics*, 645 F.3d at 526.

However, where a binding agreement to arbitrate is found, "doubts concerning the scope of an arbitration clause should be resolved in favor of arbitration." *Applied Energetics*, 645 F.3d at 526. Indeed, "where the contract contains an arbitration clause, there is a presumption of

arbitrability . . . unless it may be said with positive assurance that the arbitration clause is not susceptible to an interpretation that covers the asserted dispute." *AT & T Techs.*, 475 U.S. at 650 (citation omitted); *see also Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 653 (2d Cir. 2004) (where arbitration clause exists, presumption means that "[d]oubts should be resolved in favor of coverage") (citation omitted); *Volt Info.*, 489 U.S. at 475–76 (presumption of arbitrability requires that, "in applying general state-law principles of contract interpretation to the interpretation of an arbitration agreement within the scope of the Act, due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration") (citation omitted).

The Second Circuit has established a roadmap for determining whether a particular dispute falls within the scope of an agreement's arbitration clause:

> First, recognizing there is some range in the breadth of arbitration clauses, a court should classify the particular clause as either broad or narrow. [Second], if reviewing a narrow clause, the court must determine whether the dispute is over an issue that is on its face within the purview of the clause, or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause. Where the arbitration clause is narrow, a collateral matter will generally be ruled beyond its purview. Where the arbitration clause is broad, there arises a presumption of arbitrability and arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the parties' rights and obligations under it.

*Louis Dreyfus Negoce S.A. v. Blystad Shipping*, 252 F.3d 218, 224 (2d Cir. 2001) (citation omitted); *accord JLM Indus., Inc.*, 387 F.3d at 172.

**III.   Discussion**[3]

The Agreement contains a facially valid agreement to arbitrate.  And Arnold does not dispute the validity of the Agreement in general or its arbitration provision specifically—she does not, for example, claim that these were a product of duress or fraud or are unconscionable. *See* 6/4/15 Tr. 8, 16–17; *see also Hird v. iMergent, Inc.*, No. 10 Civ. 166 (DLC), 2011 WL 43529, at *3 (S.D.N.Y. Jan. 6, 2011) (standard for invalidating facially valid arbitration agreements).

On the present motion to compel arbitration, the issue is therefore solely one of scope. Defendants argue that Arnold's claims are all committed to arbitration under the Agreement, under which Arnold agreed to submit to arbitration "[a]*ny controversy or claim* arising out of, or relating to services or compensation provided by Precision . . . and covered by [the Agreement]." Defs. Br. 4 (emphasis in original) (citation omitted).  Arnold counters that her claims (1) fall outside the scope of her Agreement with Precision, *see* Pl. Br. 4, and (2) are not arbitrable against the defendants who were not party to the Agreement (*i.e.*, Park Strategies, Alfonse, Armand, and Barbanel), *see id.* at 12.  The Court addresses these arguments in turn.

**A.     Arnold's Claims Are Covered by the Arbitration Clause**

To determine the scope of the Agreement's arbitration clause between Arnold and defendants, the Court first considers the clause's text.  As noted, the clause states that:

> *Any controversy or claim arising out of, or relating to* services or compensation provided by Precision Discovery and covered by this letter (including any such matter involving any parent, subsidiary, affiliate, successor in interest of Precision Discovery) shall be submitted first to voluntary mediation, and if mediation is not successful, then to binding arbitration.

---

[3] The parties do not dispute that the requirements of diversity jurisdiction—complete diversity and an amount in controversy exceeding $75,000—are met here. *See Strawbridge v. Curtiss*, 7 U.S. 267, 267 (1806); 28 U.S.C. § 1332.

11

Alfonse Decl. Ex. A, 4 (emphasis added).  The Second Circuit has described arbitration clauses that cover "any and all controversies" as "inclusive, categorical, unconditional and unlimited." *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996).  And it has stated that although the phrase "aris[ing] under" in an arbitration clause ordinarily limits the clause's scope, such is not so where the phrase is accompanied by the expansive phrase "relating to," in which case the arbitration clause is to be construed broadly.  *ACE Capital Re Overseas Ltd.*, 307 F.3d at 32.  Such is the case here.  The operative text here—embracing "any controversy or claim arising out of, or relating to"—therefore makes this a quintessentially broad arbitration provision.  *Id.*

The Second Circuit has held that "[w]hen parties use expansive language in drafting an arbitration clause, presumably they intend all issues that 'touch matters' within the main agreement to be arbitrated."  *Id.* at 34 (quoting *Louis Dreyfus Negoce S.A.*, 252 F.3d at 225).  Arnold's claims as to compensation due to her from Precision for her business-generation efforts of course not only "touch matters" within her Agreement—the terms under which Precision would pay Arnold for her business-generation efforts go to the very heart of that Agreement.

But Arnold's claims with respect to AEDiscovery also clearly "touch matters" within the Agreement.  Based on the allegations in the Complaint, Precision owned 49% of AEDiscovery under the joint venture agreement.  Compl. ¶ 138.  Arnold's dealings with the defendants with respect to the AEDiscovery episode, and her claims that Barbanel sought to involve her in a fraud scheme involving AEDiscovery, arise out of her relationship with Precision and Barbanel, Precision's head.  Arnold also came into contact with Barbanel in the course of her work as an independent contractor for Precision.  And Arnold claims that it was in the course of negotiations with Precision regarding the Agreement that she alerted the defendants to the opportunity they could have to obtain federal contracts if they applied in the name of a company that was

majority-owned by a woman (Arnold).  Finally, in arguing that her AEDiscovery-related claims fall outside the scope of the Agreement's arbitration clause, Arnold alleges that "because [she] refused to participate in this scheme, defendants retaliated [against her] by terminating her contract with Precision, refusing to provide her with commissions she had already earned, continuing to conceal the identities of other clients [she] had served and depriving her of the commissions to which she was entitled after their retaliatory conduct." Pl. Br. 11.  That is, Arnold claims that because she did not participate in the AEDiscovery fraudulent scheme, defendants breached the Agreement.

Thus, each of Arnold's allegations of defendants' retaliation here further demonstrate how her AEDiscovery-related claims are intertwined with the Agreement.  Since Arnold's AEDiscovery claims are "naturally dependent" on her relationship with Precision, they are subject to mandatory arbitration. *Campaniello Imps., Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 668 (2d Cir. 1997); *see also, e.g.*, *Louis Dreyfus Negoce S.A.*, 252 F.3d at 228–29 (finding letters of indemnity within the scope of an arbitration clause in a charter party agreement and stating that a "collateral agreement" is "a separate, side agreement, connected with the principal contract which contains the arbitration clause"); *Alemac Ins. Servs., Inc. v. Risk Transfer Inc.*, No. 03 Civ 1162 (WHP), 2003 WL 22024070, at \*5 (S.D.N.Y. Aug. 28, 2003) (plaintiff claimed breach of contract, for a contract that did not have any type of remedy clause, but court found that claim "touche[d] upon" a "separate, albeit related" contract that contained a broad arbitration clause); *In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 406 (S.D.N.Y. 2003) (finding plaintiffs' antitrust claims "touch [ed] matters" covered by the agreement containing the arbitration clause).

It is no answer that some of Arnold's claims as to AEDiscovery are common law claims, and do not assert or imply a breach of her Agreement with Precision. "[C]ourts must 'focus on the allegations in the complaint rather than the legal causes of action asserted.' If the allegations underlying the claims 'touch matters' covered by the parties' agreement[], then those claims must be arbitrated, whatever the legal labels attached to them." *Norcom Elecs. Corp v. CIM USA Inc.*, 104 F. Supp. 2d 198, 203–04 (S.D.N.Y. 2000) (quoting *Collins & Aikman Prods. Co. v. Building Sys., Inc.*, 58 F.3d 16, 21 (2d Cir. 1995)) (alteration in original). Indeed, courts in this District have commonly compelled arbitration where plaintiffs brought common law claims that fell within the scope of a broad arbitration clause. *See, e.g.*, *Protostorm, LLC v. Antonelli, Terry, Stout & Kraud, LLP*, No. 08 Civ. 931 (NGG), 2010 WL 785316 (E.D.N.Y. Mar. 8, 2010) (compelling company and co-founder to arbitrate contract and common law claims against former company counsel); *Kuchinsky v. Curry*, No. 09 Civ. 299 (DLC), 2009 WL 1492225 (S.D.N.Y. May 28, 2009) (compelling employee to arbitrate statutory, common law, and contract claims against former employer); *Coffer v. Serv. Asset Mgmt. Co.*, No. 02 Civ. 9934 (DC), 2003 WL 22493425 (S.D.N.Y. Nov. 4, 2003) (compelling employees to arbitrate claims, including tortious interference, against former employer); *Norcom Elecs. Corp.*, 104 F. Supp. 2d at 203–06 (finding that claims of, *inter alia*, tortious interference, unfair competition, and conspiracy "touch[ed] upon matters covered by" the distribution agreement and therefore were arbitrable).

Arnold, finally, argues that she understood the arbitration clause to be narrow in scope when she signed the Agreement. Pl. Br. 5. She states that "she played no role in the preparation of the [arbitration] agreement" and that "it was presented to [her] for [her] signature." *Id.* In her understanding, her claims "do not relate to [her] interpretation of the agreement," and that she "obviously never agreed to arbitrate issues stemming from the extensive patterns of fraud and

14

deceit." *Id.* at 5, 7.  But the Agreement's text, not Arnold's subjective beliefs, governs.  "Under New York law, a person who signs or accepts a written contract is conclusively presumed to know its contents and assent to them."  *Isaacs v. OCE Bus. Servs., Inc.*, 968 F. Supp. 2d 564, 569 (S.D.N.Y. 2013); *cf. Dixon v. NBCUniversal Media, LLC*, 947 F. Supp. 2d 390, 401–02 (S.D.N.Y. 2013) (plaintiff's "claimed subjective misunderstanding of these [contract] terms does not relieve her from the obligation to arbitrate"); *Morris v. Snappy Car Rental*, 84 N.Y.2d 21, 30 (1994) (finding that plaintiff's failure to read the agreement did not bar enforcement of the agreement where provisions were set forth clearly and legibly and there was no allegation of deceptive or improper tactics).  Here, Arnold is bound by the Agreement's terms, which embrace all claims Arnold's Complaint raises.

### B. All Defendants Are Covered by the Arbitration Clause

Arnold separately argues that, even if the Agreement reaches her substantive claims, it applies only to claims against Precision, and not to the other defendants, who are not signatories to the Agreement.  Pl. Br. 12.  But the terms of the Agreement are to the contrary.  As noted, it applies to "any parent, subsidiary, affiliate, successor in interest of Precision."  Alfonse Decl., Ex. A, at 4.  And the defendants are all alleged to have been officers and affiliates of Precision.  Barbanel is Precision's past and present president and CEO; Alfonse and Armand were equity partners of Precision; *id.* Ex. A ¶¶ 2, 4; *id.* Ex. B ¶ 3; Park Strategies is an affiliate of Precision's, and Alfonse and Armand are among its managing directors, *id.* Ex. B ¶ 2; and Arnold admits having negotiated the Agreement with Barbanel and Armand, Compl. ¶ 27.  Moreover, Arnold alleges that defendants Alfonse, Armand, Barbanel, and Precision all participated in fraud and deceptive conduct as to Precision's alleged failure to pay her the commission income to which

she was entitled under the Agreement, and that Park Strategies and Alfonse tortiously interfered with the Agreement. Those claims also derive from defendants' roles and activities at Precision.

Under these circumstances, the law does not require differentiating between Precision and its officers and affiliates because the latter were not signatories to the Agreement, with claims against Precision to be pursued in arbitration and claims against the other defendants to be pursued in a separate but parallel litigation. On the contrary, even where an arbitration clause does not mention affiliated entities, the Second Circuit "consistently [has] held that employees or disclosed agents of an entity that is a party to an arbitration agreement are protected by that agreement." *Campaniello*, 117 F.3d at 668 (citing *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1360 (2d Cir. 1993)); *see also Alghanim v. Alghanim*, 828 F. Supp. 2d 636, 650 (S.D.N.Y. 2011); *Washington v. William Morris Endeavor Entm't, L.L.C.*, No. 10 Civ. 9647 (PKC), 2011 WL 3251504, at *9 (S.D.N.Y. July 20, 2011); *Hamerslough v. Hipple*, No. 10 Civ. 3056 (NRB), 2010 WL 4537020, at *2–3 (S.D.N.Y. Nov. 4, 2010).

This Court, in fact, encountered a similar circumstance to the one here in *Crewe v. Rich Dad Educ., LLC*, 884 F. Supp. 2d 60, 75 (S.D.N.Y. 2012). The plaintiff there argued that a binding arbitration clause required arbitration only of his claims against the signatory defendant, not the non-signatory defendants. *Id.* at 72, 75. The arbitration provision, however, applied to "our parent entity, subsidiaries, affiliates, officers, directors, shareholders, employees, agents, licensees, successors, and assigns." *Id.* at 75. The Court held that non-signatory defendants covered by that clause could insist upon arbitration, inasmuch as they were affiliates and/or agents of the signatory defendant. *Id.*

The Court accordingly rejects Arnold's argument that she is not required to arbitrate her disputes with non-Precision defendants. The arbitration agreement covers her claims against those defendants, too.

### C. Whether to Stay or Dismiss this Case

The FAA provides that, where the asserted claims are "referable to arbitration," a court shall "stay the trial of the action until such arbitration has been had." 9 U.S.C. § 3. Defendants, however, ask this Court to dismiss, rather than stay, the case. *See* Defs. Br. 10. Defendants are correct that "where all of the issues raised in the Complaint must be submitted to arbitration, the Court may dismiss an action rather than stay proceedings." *Arrigo v. Blue Fish Commodities, Inc.*, 704 F. Supp. 2d 299, 305 (S.D.N.Y. 2010) (citation and alteration omitted); *see also Kowalewski v. Samandarov*, 590 F. Supp. 2d 477, 491 (S.D.N.Y. 2008); *Salim Oleochemicals v. M/V Shropshire*, 278 F.3d 90, 93 (2d Cir. 2002) (Sotomayor, J.) (instructing district courts to state clearly "whether they truly intend to dismiss an action or mean to grant a stay").

However, as the Second Circuit has recognized, a decision to dismiss a case as to which a court has compelled arbitration may impede the process of arbitration, because a dismissal, unlike a stay, is an immediately appealable order. *See Salim Oleochemicals*, 278 F.3d at 93. Such a dismissal may therefore result in an "[u]nnecessary delay of the arbitral process through appellate review," which "is disfavored"; the Second Circuit has admonished district courts "to be mindful of th[e] liberal federal policy favoring arbitration agreements when deciding whether to dismiss an action or instead to grant a stay." *Id*. (citation omitted).

Consistent with this admonition, courts in this District that have compelled arbitration, including this Court, have commonly chosen to stay district court proceedings, even where urged to dismiss them. *See, e.g.*, *Christensen v. Nauman*, No. 14 Civ. 5367 (PAE), 2014 WL 7392916,

17

at *10 (S.D.N.Y. Dec. 29, 2014); *Variblend Dual Dispensing Sys., LLC v. Seidel GmbH & Co., KG*, 970 F. Supp. 2d 157, 170 n.6 (S.D.N.Y. 2013); *Dixon*, 947 F. Supp. 2d at 405; *Duraku v. Tishman Speyer Props., Inc.*, 714 F. Supp. 2d 470, 475 (S.D.N.Y. 2010); *Douce v. Origin ID TMAA 1404–236–5547*, No. 08 Civ. 483 (DLC), 2009 WL 382708, at *5 (S.D.N.Y. Feb. 17, 2009). This Court elects to do so here, to promote expeditious resolution of this dispute.

## CONCLUSION

For the foregoing reasons, defendants' motion to compel arbitration is granted. The case is stayed pending the outcome of arbitration. The Clerk of Court is directed to close the motion pending at docket number 5, and to place this case on the suspense docket.

The parties are directed to submit a joint status letter to the Court, advising it as to the status of arbitration proceedings, every 90 days, measured from the date of this Opinion.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: July 23, 2015
       New York, New York